# Illinois Official Reports

## Appellate Court

---

**_People v. McMichaels_, 2019 IL App (1st) 163053**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DeANDRE McMICHAELS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>No. 1-16-3053 |
| Filed<br>Rehearing denied | October 29, 2019<br>May 5, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CR-8706; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Lauren A. Bauser, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Marci Jacobs, and Delicia D. Zayas, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Justices Lavin and Coghlan concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a bench trial, defendant DeAndre McMichaels was convicted of one count of being an armed habitual criminal and was sentenced to eight years' imprisonment. On appeal, he argues that the trial court erred in denying his motion to quash arrest and suppress evidence where police officers conducted an unreasonable stop and search in violation of *Terry v. Ohio*, 392 U.S. 1 (1968), and lacked probable cause to arrest him. We affirm.

¶ 2      **I. BACKGROUND**

¶ 3      Defendant was charged by indictment with one count of being an armed habitual criminal, two counts of unlawful possession of a weapon by a felon, and four counts of aggravated unlawful use of a weapon, arising from an incident in Chicago on May 24, 2016. The State proceeded on one count of the armed habitual criminal offense (720 ILCS 5/24-1.7(a) (West 2016)) and one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). Defendant filed a motion to quash arrest and suppress evidence, which was heard concurrently with the trial.

¶ 4      Chicago police officer Christopher Cannata testified that on May 24, 2016, at approximately 3:25 p.m., he was on patrol with Officers Patrick Martino and Pavone[1] in an unmarked vehicle near the 4900 block of West Ferdinand Street. The officers received a dispatch regarding "a male black with a black T-shirt, yellow shorts and dreadlocks in possession of a black handgun" near Ferdinand Street and Lamont Avenue. The description matched a person the officers had seen there earlier in the day, whom Cannata identified in court as defendant. When the officers returned to the area, Cannata observed defendant wearing the same clothes and standing with three other men. The officers parked 10 to 15 feet away, exited the vehicle, announced their office, and "asked to see all the individuals's [*sic*] hands."

¶ 5      According to Cannata, the three men around defendant showed their hands, but defendant "immediately placed one hand into his right short pockets [*sic*] and then began to turn away from us." The officers approached defendant and again asked to see his hands, but he "did not comply." Seconds later, Martino grabbed defendant's shoulder or upper arm. Cannata observed defendant's hand "break free from his pocket" and noticed "the butt and re-slide of a semi-automatic handgun" protruding from the right pocket of his shorts. Cannata seized the firearm, which was loaded with seven live rounds, and defendant was handcuffed. As Cannata and Martino walked defendant to their vehicle, "he blurted out that he just had the gun for protection because he had been shot."

¶ 6      On cross-examination, Cannata stated that he saw defendant at Lamont Avenue and Ferdinand Street in a large group of people "less than an hour" before the dispatch but had no contact with him. At that time, defendant was not holding a weapon, and only his clothing caught Cannata's attention. Cannata never spoke with the person who called the police to report an individual with a firearm and did not know the person's identity. Cannata added that, when the officers exited their vehicle and approached defendant, he turned away but did not make other movements. When Martino grabbed defendant, his hand was in his pocket. Cannata

---

[1]Officer Pavone's first name does not appear in the transcript.

explained that Martino made physical contact with defendant "[f]or our safety, mainly based on his lack of listening to our orders."

¶ 7   Martino testified that he advised defendant of his *Miranda* rights at the police station. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant stated that he understood his rights and said "the only reason why he had a handgun on his person was for his protection because he ha[d] been shot earlier on that block." On cross-examination, Martino did not recall whether defendant made any statements at the location of his arrest.

¶ 8   The State entered a stipulation between the parties that defendant had two qualifying felony convictions for purposes of the armed habitual criminal statute. Afterwards, the State rested, and defendant moved for a directed finding, which the trial court denied. The defense rested without presenting evidence.

¶ 9   In support of defendant's motion to quash arrest and suppress evidence, defense counsel argued that the call to police, reporting someone with a firearm, was unreliable because nothing established the caller's identity, motive, or basis for knowledge. Counsel posited that the fact that officers noticed defendant wearing the same clothes as the person whom the caller described was insufficient corroboration for a search and seizure and that no probable cause existed because the officers did not observe a firearm until they searched defendant. The State, in response, submitted that "a concerned citizen is ordinarily considered more credible" than a paid informant. Additionally, the State maintained that the officers conducted a valid *Terry* stop where they were told a person resembling defendant was carrying a firearm and defendant put his hand in his pocket and turned away when the officers approached him and asked to see his hands.

¶ 10   The trial court denied defendant's motion and found him guilty of being an armed habitual criminal and unlawful possession of a weapon by a felon. According to the court, the fact the officers had seen defendant prior to the dispatch "just goes to location" and did not prove "any type of *** criminal activity." The court explained, however, that defendant's conduct in putting his hand in his pocket and turning away when the officers asked to see his hands, coupled with the officers' knowledge that someone resembling defendant reportedly possessed a firearm, created an "articulable suspicion about officer safety" and, therefore, the *Terry* stop was justified. The court did not comment whether probable cause existed for defendant's arrest.

¶ 11   Defendant filed a motion for new trial, arguing, in relevant part, that the trial court erred in denying his motion to suppress. The court denied the motion. Following a hearing, the court merged the counts and sentenced defendant to eight years' imprisonment for being an armed habitual criminal.

¶ 12                                    II. ANALYSIS

¶ 13   On appeal, defendant contends that the trial court erred in denying his motion to suppress because the officers lacked a reasonable, articulable suspicion to conduct the *Terry* stop that produced the firearm and his statements. Relying on *People v. Aguilar*, 2013 IL 112116, defendant submits that "mere possession of a firearm outside the home, without more, is not a crime" and, therefore, the call about a person with a firearm did not provide the officers with a reasonable suspicion of criminal activity to justify ordering him to show his hands and restraining him when he refused, particularly where he was not engaged in suspicious conduct when the officers observed him. Even if his conduct justified a protective pat down, defendant maintains the recovery of the firearm did not create probable cause for his arrest because, when

the officers arrested him, they did not know whether he lacked a concealed carry license or had prior felony convictions.

¶ 14    In the trial court, the defendant has the burden of proof on a motion to quash arrest and suppress evidence. *People v. Cregan*, 2014 IL 113600, ¶ 23. "If the defendant makes a *prima facie* showing that the evidence was obtained in an illegal search or seizure, the burden shifts to the State to provide evidence to counter the defendant's *prima facie* case." *Id.* However, "[t]he ultimate burden of proof remains with the defendant." *Id.* On review, the trial court's factual findings will be reversed only when they are against the manifest weight of the evidence (*People v. Manzo*, 2018 IL 122761, ¶ 25), but the "legal ruling on whether the evidence should be suppressed is reviewed *de novo*" (*People v. Bonilla*, 2018 IL 122484, ¶ 8).

¶ 15    The fourth amendment to the United States Constitution and the Illinois Constitution of 1970 both "guarantee the right of individuals to be free from unreasonable searches and seizures." *People v. Colyar*, 2013 IL 111835, ¶ 31; see U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6. Typically, seizures require a warrant supported by probable cause. *People v. Johnson*, 237 Ill. 2d 81, 89 (2010). Pursuant to *Terry*, however, "a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to, commit a crime." *People v. Close*, 238 Ill. 2d 497, 505 (2010) (citing *Terry*, 392 U.S. at 22). Further, "when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, the officer may conduct a pat-down search to determine whether the person is in fact carrying a weapon." *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001) (citing *Terry*, 392 U.S. at 24). "Whether an investigatory stop is valid is a separate question from whether a search for weapons is valid." *People v. Thomas*, 198 Ill. 2d 103, 109 (2001).

¶ 16    Because the fourth amendment is not implicated until a seizure occurs, our first inquiry is to determine when defendant was seized. *People v. Nitz*, 371 Ill. App. 3d 747, 750 (2007). Under the fourth amendment, "an individual is seized when an officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen." (Internal quotation marks omitted.) *People v. Harris*, 228 Ill. 2d 222, 246 (2008). Formulated another way, "a person has been seized when, considering the totality of the circumstances, a reasonable person would believe he was not free to leave." *People v. Oliver*, 236 Ill. 2d 448, 456 (2010) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). In considering whether a seizure occurred, courts consider "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; or (4) using language or tone of voice compelling the individual to comply with the officer's requests." *Id.* (citing *Mendenhall*, 446 U.S. at 554).

¶ 17    The *Mendenhall* test "states a necessary, but not a sufficient, condition for seizure." *Thomas*, 198 Ill. 2d at 111 (citing *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). This is because, "[w]hile an officer's show of authority may amount to a seizure [citation], *** a defendant is not seized when he ignores a show of authority." *People v. Billingslea*, 292 Ill. App. 3d 1026, 1030 (1997). Thus, in *Thomas*, our supreme court explained:

> " 'The police may well convey a reasonable feeling of restraint, but that message does not amount to a seizure within the meaning of the fourth amendment until there is submission to it. A person must submit to a show of authority before that show of

- 4 -

authority can constitute a seizure.' " (Emphasis omitted.) *Thomas*, 198 Ill. 2d at 112 (quoting *People v. Thomas*, 315 Ill. App. 3d 849, 857 (2000)).

¶ 18    Here, defendant argues he was seized by the officers "immediately upon their arrival" at Ferdinand Street and Lamont Avenue, when they exited their vehicle and ordered him and the other men to "put their hands up." According to defendant, the officers' number and language showed compliance was mandatory, as further evidenced by the fact the other men displayed their hands and, when defendant did not, the officers grabbed him. We disagree.

¶ 19    At trial, Cannata testified that the officers parked 10 to 15 feet from defendant and the other men. The officers exited their vehicle and announced their office, but no evidence showed they displayed weapons or touched any of the men. When the officers "asked to see" the men's hands, three of them complied, but defendant "immediately" placed one hand in his pocket and "began to turn away." The officers approached him and asked to see his hands a second time, but defendant again "did not comply." At that point, Martino grabbed defendant's shoulder or arm.

¶ 20    Between the moment the officers arrived and the time Martino grabbed defendant, defendant refused two requests to display his hands and, instead, placed his hand in his pocket and turned away. Under these circumstances, defendant did not submit to the officers' authority upon their arrival. See *Billingslea*, 292 Ill. App. 3d at 1030 (finding the defendant "did not submit to the assertion of authority" when an officer "ordered him to keep his hands where he could see them" but defendant "turned away [and] reached for an object in his waistband"). Consequently, defendant was not seized until Martino grabbed him. See *Harris*, 228 Ill. 2d at 246; *People v. Evans*, 2017 IL App (4th) 140672, ¶ 31 (the defendant "resisted [an officer's] authority by continuing to place his hands back into his pockets" and "was not seized until [the officer] frisked him").

¶ 21    Having determined when defendant was seized, our next inquiry is whether the officers were justified in conducting a *Terry* stop at that moment.

¶ 22    *Terry* permits an officer to conduct a brief, investigatory stop of a person whom the officer reasonably believes "has committed, or is about to, commit a crime." *Close*, 238 Ill. 2d at 505 (citing *Terry*, 392 U.S. at 22). To justify a *Terry* stop, officers must be able to point to specific and articulable facts that, considered with the rational inferences therefrom, make the intrusion reasonable. *People v. Timmsen*, 2016 IL 118181, ¶ 9. "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior, and due weight must be given to the reasonable inferences the officer is entitled to draw from the facts in light of his experience." *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 19. While reasonable suspicion is a less stringent standard than probable cause, an officer's hunch or unparticularized suspicion is insufficient. *People v. Williams*, 2016 IL App (1st) 132615, ¶ 44. Ultimately, "[i]n determining whether the officer had a reasonable suspicion, a court considers the totality of the circumstances known to the officer" (*In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 97) and views those facts "from the perspective of a reasonable officer at the time of the stop" (*People v. Sanders*, 2013 IL App (1st) 102696, ¶ 14).

¶ 23    Based on the totality of the circumstances, we find the *Terry* stop was valid. When Martino grabbed defendant, the officers had been told that a person matching defendant's description was reportedly in possession of a firearm. Seconds earlier, defendant had twice refused the officers' requests to show his hands and instead put his hand in his pocket and turned away. Defendant's hand was still in his pocket when Martino grabbed him, and Cannata testified that

defendant's conduct posed a safety concern. Thus, although "an individual's refusal to cooperate, without more, does not amount to reasonable suspicion" (*Timmsen*, 2016 IL 118181, ¶ 10), the officers' decision to detain defendant resulted from more than just his noncompliance with their request to show his hands and was reasonable given the facts known to the officers at the relevant time.

¶ 24 In reaching this conclusion, we observe that the reliability of the tip that resulted in the officers' dispatch is not dispositive of the validity of the *Terry* stop. Defendant was not seized when the officers arrived on the scene in response to the tip but, rather, was seized when Martino grabbed him. While only a few seconds passed between when the officers arrived and the moment the seizure occurred, in that time, the officers became aware of other circumstances, including defendant's furtive conduct in response to their request to see his hands. Thus, the tip was just one of several factors that, viewed from the perspective of a reasonable officer, made the *Terry* stop valid. See *Sanders*, 2013 IL App (1st) 102696, ¶ 14.

¶ 25 Although the validity of an investigatory stop is typically a different issue from the validity of a search for weapons (*Thomas*, 198 Ill. 2d at 109), in this case, Cannata observed the firearm during the *Terry* stop. Cannata testified that, after Martino grabbed defendant, defendant's hand "br[oke] free from his pocket" and "the butt and re-slide of a semi-automatic handgun" protruded from the right pocket of his shorts. Cannata seized the firearm, and defendant was handcuffed. When Cannata noticed the firearm in plain sight, he knew that defendant was armed and possibly dangerous and, therefore, could clearly "point to specific, articulable facts which *** reasonably warrant[ed] the intrusion" involved in seizing the firearm. *People v. Flowers*, 179 Ill. 2d 257, 264 (1997). Consequently, the officers legally recovered the firearm, and defendant's challenge to the *Terry* stop is without merit.

¶ 26 Defendant contends, however, that the recovery of the firearm did not create probable cause for his arrest because "mere possession of a firearm outside the home, without more, is not a crime" and, at the time of his arrest, the officers did not know whether he lacked a concealed carry license or had felony convictions.

¶ 27 An arrest executed without a warrant is valid only when it is supported by probable cause. *People v. Grant*, 2013 IL 112734, ¶ 11. "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008). The existence of probable cause depends on "the totality of the circumstances at the time of the arrest" and "is governed by commonsense considerations." *Grant*, 2013 IL 112734, ¶ 11. "[T]he calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." *Id.*

¶ 28 In *Aguilar*, our supreme court held that a portion of the aggravated unlawful use of a weapon statute—which "categorically prohibit[ed] the possession and use of an operable firearm for self-defense outside the home"—violated the second amendment of the United States Constitution. *Aguilar*, 2013 IL 112116, ¶ 21. The supreme court explained that "the second amendment right to keep and bear arms extends beyond the home" but is still subject to meaningful regulation. *Id.* ¶¶ 20-21. In Illinois, those regulations include laws such as the unlawful possession of a weapon by a felon statute (720 ILCS 5/24-1.1(a) (West 2016)), which prohibits felons from possessing firearms. Other regulations include the requirement that, in order to possess a handgun, a person must carry a Firearm Owners Identification (FOID) card issued to him or her by the state police. 430 ILCS 65/2 (West 2016). To carry a concealed

firearm, a FOID cardholder also must possess a license under the Firearm Concealed Carry Act (430 ILCS 66/10, 25 (West 2016)).

¶ 29 The Firearm Concealed Carry Act further provides that, if an officer initiates an investigative stop, upon the request of the officer, a licensee must disclose that he or she possesses a concealed firearm, present his or her license, and identify the firearm's location. *Id.* § 10(h). Pursuant to section 108-1.01 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/108-1.01 (West 2016)), when an officer has stopped a person for temporary questioning and "reasonably suspects that he or another is in danger of attack, he may search the person for weapons" and may take the weapon "until the completion of the questioning, at which time he shall either return the weapon, if lawfully possessed, or arrest the person so questioned."

¶ 30 Defendant was arrested on May 24, 2016, after *Aguilar* was decided. On that date, the categorical prohibition on the possession of an operable firearm outside the home was unconstitutional. As the officers did not inquire whether defendant had a concealed carry license or felony convictions before arresting him, defendant maintains he was arrested without probable cause. Again, we disagree.

¶ 31 Our supreme court has explained that "the existence of probable cause depends upon the totality of the circumstances at the time of the arrest." *Wear*, 229 Ill. 2d at 564. These circumstances include "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (Internal quotation marks omitted.) *Id.* "The standard is the probability of criminal activity, not proof beyond a reasonable doubt or even that it be more likely than not." *People v. Gocmen*, 2018 IL 122388, ¶ 19.

¶ 32 Applying these principles here, the totality of the circumstances when the officers arrested defendant suggested criminal activity. To briefly restate the facts, the officers responded to a report that a person matching defendant's three-point description possessed a firearm. The officers asked defendant and three other men to show their hands. The three other men complied, but defendant twice ignored the officers' requests and, instead, placed his hand in his pocket and turned away. At that point, the officers conducted a *Terry* stop, recovered a loaded firearm from defendant's pocket, and handcuffed him. While the officers did not inquire about his criminal history or firearm licenses at that moment, "the existence of a possible innocent explanation, like defendant's possession of the required gun licenses, [does] not necessarily negate probable cause." *Thomas*, 2019 IL App (1st) 170474, ¶ 39. Instead, defendant's repeated noncompliance with the officers' requests, the fact he turned away and kept his hand in his pocket, and the discovery of the firearm in that pocket are all practical considerations justifying probable cause that he illegally possessed the firearm. See *People v. Smith*, 2015 IL App (1st) 131307, ¶ 29 ("furtive movements may be considered justification for performing a warrantless search when coupled with other circumstances tending to show probable cause," even though "looks, gestures, and movements taken alone are insufficient" (internal quotation marks omitted)).

¶ 33 Defendant has cited *Thomas*, 2019 IL App (1st) 170474, as authority for his position that his arrest should have been quashed. In defendant's motion to cite *Thomas* as additional authority, he asserts that "*Thomas* makes clear that it is not reasonable to presume that, simply because a handgun may be visible in public, it was necessarily being carried in violation of the law" and that defendant's "possession of a handgun did not give the officers an objectively reasonable basis to believe that he was violating the law." Defendant claims that his arrest was

not justified because, upon discovering that he was in possession of the handgun, the police immediately arrested him "without any inquiry into whether his possession of the handgun was lawful."

¶ 34    In *Thomas*, this court stated that, "under the current legal landscape, police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity." *Id.* ¶ 40. We stated that the police "cannot use a firearm in partial view, such as a semi-exposed gun protruding from the pant pocket of a person on a public street, alone as probable cause to arrest an individual for illegal possession without first identifying whether the individual has the necessary licenses." *Id.* We cautioned "against 'an arrest first, determine licensure later' method of police *patrol*." (Emphasis added.) *Id.* However, despite this admonition, we nevertheless found that the totality of the circumstances—such as the defendant's flight, his actions of handing his gun to another person in a common area of an apartment upon seeing the police, and then fleeing the scene—gave the police probable cause to believe that the defendant illegally possessed the gun. *Id.* ¶ 38. Likewise, here, as described above, even though the officers did not inquire as to whether defendant lawfully possessed the gun, including whether he had a valid concealed carry license or felony convictions, before they arrested him, the police had probable cause to arrest defendant based on the totality of the circumstances.

¶ 35    Further, we note that our admonition in *Thomas* against " 'arrest first, determine licensure later,' " must be balanced against officer safety. See *id.* ¶ 40.

¶ 36    Public policy demands that police must be safe in the performance of their duties. Officers here were acting on a citizen tip that there was a man (1) with dreadlocks, (2) in yellow shorts, (3) in a black T-shirt, and (4) in possession of a gun at a specific location. When the police got to that location and saw the man matching that particularized description and asked him and his friends to stop and show their hands, he declined the officers' request, placed one hand in his pocket, and turned away from them. He then refused to comply with the officers' second request to see his hands. Based on information that defendant had a gun and the combination of factors in this case, as previously described, the officers were justified in conducting a *Terry* stop when they stepped behind him and grabbed his shoulder. It was at this time, during the *Terry* stop, that they discovered he was in possession of a handgun.

¶ 37    Under section 108-1.01 of the Code, when an officer has stopped a person under the "Search During Temporary Questioning" provision in the Code and "reasonably suspects that he or another is in danger of attack, he may search the person for weapons" and take the weapon "until the completion of the questioning, at which time he shall either return the weapon, if lawfully possessed, or arrest the person" that was questioned. 725 ILCS 5/108-1.01 (West 2016). Further, under the Firearm Concealed Carry Act, "upon the request of the officer the licensee *** shall disclose to the officer that he or she is in possession of a concealed firearm under this Act." 430 ILCS 66/10(h) (West 2016).

¶ 38    We recognize that the officers did not question defendant under section 108-1.01 of the Code or the Firearm Concealed Carry Act to determine whether he had a valid concealed carry license or felony convictions. However, defendant also did not volunteer information to the officers. A reasonable person who was not committing a crime (*i.e.*, who had the valid licenses) would be expected to tell the officers he was licensed to have and carry a gun.

¶ 39    When the officers initially asked defendant to see his hands, he could have notified them that he lawfully had a gun. During the *Terry* stop, when the officers saw the gun protruding from defendant's pocket, defendant had an opportunity to offer the information that he was

- 8 -

properly licensed or otherwise in lawful possession. He did not. When the officers took the gun, defendant could have offered up license information, but once more, he did not. Defendant had multiple opportunities to protect his legitimate interests and volunteer the information that he was licensed. That would have been the end of it. In the absence of such information and in combination with all other factors previously described, even though the officers did not inquire about whether defendant had a valid license, the officers were fully justified in detaining and arresting defendant before they could confirm his licensure and the lawfulness of the possession of the gun without his help.

¶ 40    After oral arguments, we granted defendant leave to additionally cite *People v. Horton*, 2019 IL App (1st) 142019-B, which, according to defendant, supports his argument that his mere "voluntary decision not to engage with the police" could not support a finding of reasonable suspicion. However, in *Horton*, the defendant filed a motion to quash arrest and suppress evidence that solely challenged whether the officers had probable cause to arrest him. *Id.* ¶ 13. As this court observed, the evidence in *Horton* also showed that only an arrest, and not a stop, occurred. *Id.* ¶ 65. Specifically, the evidence showed that a police officer saw the defendant merely stand outside a house with a " 'metallic object in his waistband,' " turn, and "rush[ ]" inside the house. *Id.* ¶¶ 14-15. The officer entered the house, saw the defendant "crouched next to a bed" in a bedroom, "detained" the defendant, and recovered a handgun from under the mattress. *Id.* ¶ 16. The circuit court denied the defendant's motion to quash and suppress. *Id.* ¶ 22. We reversed the circuit court's decision, however, and found that the defendant's mere flight from the police officers did not give rise to probable cause to arrest. *Id.* ¶¶ 65-68, 76, 87.

¶ 41    Here, unlike in *Horton*, the officers initially conducted a *Terry* stop, which uncovered evidence supporting probable cause to arrest. Accordingly, the officers' initial seizure of defendant only needed to be justified by circumstances meeting the "lower standard of reasonable suspicion as opposed to the more exacting standard of probable cause." *Id.* ¶ 65. Additionally, unlike in *Horton*, there were circumstances other than defendant's flight to support defendant's arrest. Specifically, the officers received a report that a person matching defendant's description possessed a firearm and asked defendant and three other men to show their hands. Defendant repeatedly refused to comply, placed his hand in his pocket, and turned away. The officers were then justified to perform a *Terry* stop, and upon recovering a loaded firearm from defendant, they were justified in arresting him. The circumstances of defendant's stop and eventual arrest were not limited to defendant's mere refusal to cooperate with the officers, as defendant suggests, and so *Horton* does not apply.

¶ 42    Also after oral arguments, the State was granted leave to additionally cite *People v. Foskey*, 136 Ill. 2d 66 (1990). *Foskey* stands for the finding that, if the State prevails on a defendant's motion to suppress, then the State has not waived an argument that might also have been raised in support of the trial court's ruling, given that the argument is not inconsistent with the position the State took at trial. *Id.* at 84-85. The State cites *Foskey* as additional authority because, during oral arguments, defendant argued in rebuttal that the State changed its theory on appeal by newly asserting that the officer's initial stop was a consensual encounter. However, we have found this case rests on a *Terry* stop, so further analysis of *Foskey* is unnecessary.

¶ 43    In addition, the State was granted leave to "reiterate" *Thomas*, 2019 IL App (1st) 170474, after oral arguments for purposes of emphasizing that defendant had the initial burden of

establishing that his stop and arrest were unreasonable. However, the facts in this case do not make it necessary to belabor this aspect of *Thomas*, since defendant chose not to offer any evidence or testify and the uncontradicted testimony of the officers demonstrated a valid *Terry* stop.

¶ 44                                   III. CONCLUSION

¶ 45        In sum, the evidence showed that officers conducted a valid *Terry* stop, resulting in the discovery of a firearm, and that the officers had probable to cause to arrest defendant, based on all the surrounding circumstances. Consequently, the trial court did not err in denying defendant's motion to quash arrest and suppress evidence. Because the firearm and defendant's postarrest statements were not subject to exclusion, we do not reach defendant's further contention that no exceptions to the exclusionary rule apply to that evidence. Consequently, defendant's conviction for being an armed habitual criminal is affirmed.

¶ 46        Affirmed.