2021 IL App (1st) 180927-U
No. 1-18-0927
Order filed May 17, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 14428 |
| | ) | |
| IELIOT JACKSON, | ) | Honorable |
| | ) | Darron E. Bowden and |
| Defendant-Appellant. | ) | Patrick K. Coughlin, |
| | ) | Judges, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Walker and Justice Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Reversed conviction of possession of cannabis where the trial court erroneously
denied Jackson's motion to suppress evidence.

¶ 2    A jury convicted Ieliot Jackson of possession of more than 30 but not more than 100 grams

of cannabis and sentenced him to two years' imprisonment. On appeal, Jackson argues the trial

court erred in denying his motion to suppress evidence because the police officer lacked

reasonable, articulable suspicion of criminal activity. We agree.

¶ 3     Jackson was seized when officers frisked him after approaching him in a manner that blocked his access to his SUV while asking him accusatory questions. At that moment, the only evidence officers had to justify his seizure was Jackson's decision to run out of the way of a police car in a parking lot and his tossing an unknown object into the backseat of his SUV. Amounting to nothing more than a hunch, the officers failed to justify seizing Jackson, frisking him, and searching his SUV. The trial court should have granted Jackson's motion to suppress and because the State could not have secured a conviction without the unlawfully obtained evidence, we reverse Jackson's conviction outright.

¶ 4                                  Background

¶ 5     Charged with 11 counts, Jackson went to trial on one count of armed habitual criminal (720 ILCS 24-1.7(a) (West 2016)) and one count of possession with intent to deliver more than 30 but not more than 500 grams of cannabis (720 ILCS 550/5(d) (West 2016)). The State nol-prossed the other counts.

¶ 6                             *Motion to Suppress*

¶ 7     Before trial, Jackson filed a motion to quash arrest and suppress evidence alleging that the police officer who stopped him did not have a reasonable suspicion that he had been or was about to be involved in criminal activity. Jackson asserted that the officer did not see Jackson do anything illegal before approaching him and, when the officer performed a protective pat-down, he did not find firearms or illegal items on Jackson's person. Only after Jackson refused a search of his car did the officer claim he smelled marijuana, which was relied on to conduct a search leading to the discovery of physical evidence.

¶ 8 At the hearing on the motion, Markham police officer Matt Carey testified he was in uniform on routine patrol alone in a marked squad car when he saw Jackson walk through a parking lot of a night club. Carey had an unobstructed view of Jackson. According to Carey, Jackson "learned of [Carey's] presence," ran to a parked SUV, removed something from his waistband, opened the rear passenger door, and placed the item inside. Carey did not see what Jackson put in the SUV; the lot was "[f]airly dark." Jackson closed the door, opened the front passenger door, and retrieved a can of "Fix-a-Flat."

¶ 9 When Carey saw Jackson remove the item from his waistband, he called for assistance. Carey drove past the SUV, made a U-turn to face the rear of the SUV, and continued to watch Jackson as he closed the passenger door and moved to the "rear hatch" of the SUV. After assistance arrived, Carey approached Jackson on foot and asked what he was doing. Jackson said he was putting air in his tires. Before patting Jackson, Carey did not see a weapon or illegal substance on Jackson; Carey patted Jackson down and did not feel a weapon. Carey asked Jackson if he had anything illegal, and Jackson replied he did not. Carey asked if he could search the SUV, and Jackson said no.

¶ 10 A minute or two later, Carey called for a canine unit, which arrived in about a minute. Jackson then admitted he had marijuana in his pockets. Carey removed suspect marijuana from Jackson's right pocket. The dog sniffed Jackson's SUV, and Carey recovered a large freezer-sized Ziploc bag of suspect marijuana from inside the rear hatch. The bag was not visible to Carey before the dog arrived. Police also recovered a .9-millimeter high point semiautomatic handgun from under a towel or shirt below the rear passenger seat, where Carey had seen Jackson open the door and put something inside.

¶ 11    On cross-examination, Carey said Jackson's SUV had backed into a parking spot with a chain link fence behind it and an opening to the left where traffic could drive through. Carey, 20 to 30 feet away, saw Jackson's right side as he ran towards the SUV, and Jackson raise his shirt before removing an item from his waistband. "Due to the lighting" Carey could not make out the item. When Jackson opened the rear passenger door, it blocked Carey's view of Jackson's torso. Given Carey's experience as a police officer, which included recovery of many weapons from individuals' waistbands, "a common place to hold a weapon," Carey believed Jackson had removed a gun and placed it inside the SUV. He radioed for assistance because he believed Jackson had a weapon.

¶ 12    Carey drove through the opening in the fence and made a U-turn, pulling up 10 or 15 feet behind Jackson's SUV and illuminating the back of it with his headlights. Jackson opened the SUV's rear hatch, reached inside, shuffled stuff around for 30 seconds, removed a portable air compressor, and closed the trunk. Carey did not see Jackson go to a specific tire and, when Carey looked at the tires, all appeared adequately inflated.

¶ 13    Responding to a question from Carey, Jackson said he did not have anything illegal on him. Carey patted Jackson down for his and his partner's safety because he believed Jackson had a weapon and wanted to make sure that he did not have "another" one. About 30 seconds after he had left his squad car, Carey checked Jackson's waistband and chest for a hard object but did not feel anything consistent with a weapon.

¶ 14    After Jackson denied that he had anything illegal in the SUV and declined Carey's request to search it, Carey radioed for a canine unit while in Jackson's presence. When the marked "Canine Unit" vehicle pulled up a minute later, Jackson admitted he had marijuana in his pockets. Carey

had not asked him again whether he had anything on him. After recovering six bags of suspect marijuana from Jackson's pockets, Carey handcuffed Jackson and placed him inside his squad car. The canine handler conducted an open-air sniff of the SUV, and the dog indicated an illegal substance near the rear hatch. The canine handler opened the rear hatch, and the dog pointed his nose where Carey saw Jackson move things around. Carey found a bag of suspect marijuana in the rear hatch.

¶ 15    On redirect examination, Carey said he called the canine unit within a minute of speaking to Jackson because he smelled an odor of marijuana on Jackson and Jackson said he smoked it inside the club. Carey called the canine unit after Jackson told Carey he could not search the SUV.

¶ 16    Following arguments, the trial court denied Jackson's motion. The court determined that the totality of the circumstances gave rise to a reasonable suspicion of potential criminal activity as required for a *Terry* stop. Specifically, the court noted that Jackson looked at Carey, started running to the SUV, lifted his shirt, removed something from his waistband, opened the rear passenger door, and leaned in. The court noted that a brief investigative detention allowed under *Terry* then occurred. Although he found nothing during the pat-down, Carey smelled marijuana and called for a canine unit. When the canine unit pulled up, Jackson admitted that he had marijuana, which  Carey recovered from Jackson's pockets. This established probable cause for arrest. The court explained that the law allows a canine sniff around the outside of a vehicle if there is suspected contraband, and the dog alerted the officers to contraband in the rear hatch. The court added that the handgun was recovered during the search incident to arrest.

¶ 17    Jackson filed a motion to reconsider. Citing *People v. Aguilar*, 2013 IL 112116 and cases following *Aguilar*, he argued that there was no reasonable, articulable suspicion of criminal

activity sufficient to warrant a *Terry* stop based on the possible observation of a handgun. Jackson added that flight alone does not indicate criminal activity.

¶ 18    The trial court denied Jackson's motion. In particular, the court reiterated that, in Carey's experience, he thought Jackson removed a weapon from his waistband, which allowed Carey to inquire into what the item was. When Carey approached Jackson, he smelled marijuana. After Carey called for the canine unit, Jackson admitted he had marijuana on his person. The dog then indicated contraband in the SUV's rear hatch where more marijuana was recovered. The court said that if the case just concerned a weapon and an arrest occurred without question of a Firearm Owner's Identification (FOID) or concealed carry license, it would have granted Jackson's motion. But, once the officers found marijuana on Jackson and in the SUV, they had probable cause to search the SUV for a weapon.

¶ 19                                          *Trial*

¶ 20    The State proceeded to trial on one count armed habitual criminal and one count possession with intent to deliver more than 30 but not more than 500 grams of cannabis.

¶ 21    At trial, Carey testified that although he could not see the item Jackson placed in the SUV, he believed it was a weapon and called for assistance, including a canine unit. About one minute later, Markham police officer Andero, who was also in uniform, arrived in a marked vehicle. Carey and Andero got out of their cars and Carey approached Jackson on the passenger side of the SUV. Carey casually asked Jackson what he was doing and conducted a protective pat-down of Jackson for weapons. Jackson said he was inflating his tires, which did not appear deflated. During this initial encounter, Carey detected an odor of marijuana emanating from Jackson. Carey asked if Jackson had any illegal items on his person or in the SUV, and Jackson said he did not. Carey told

Jackson that he smelled marijuana and Jackson said he had smoked marijuana earlier in the day. Carey then asked if he could search Jackson's SUV, and Jackson said no. Carey responded that a canine unit was en route.

¶ 22    When the canine unit arrived, Jackson said that he had drugs in his pockets. The officers recovered suspect marijuana from Jackson's pockets, handcuffed him, and moved him into Carey's squad car. Carey asked the canine handler to conduct an open-air sniff of Jackson's SUV. After the dog indicated contraband in the rear of the SUV, Carey recovered suspect marijuana there. Carey then performed a further search of the SUV and recovered a loaded .9-millimeter high point semiautomatic handgun underneath the rear passenger seat. On cross-examination, Carey testified that he called for assistance when he saw Jackson run to his SUV and because the canine unit was on general patrol at that time, it responded.

¶ 23    Markham police officer and canine handler Joseph Johnston testified that when he got out of his vehicle, he observed Carey and Andero recover clear plastic baggies containing suspect marijuana from Jackson's front pants pockets. During an exterior air sniff of the SUV, his dog alerted Johnston to contraband in the rear "cargo area." Johnston conducted a probable cause search of the area, finding a freezer bag containing plastic baggies. The dog also helped the officers find blunt wraps containing suspect marijuana in the center console ashtray. On cross-examination, Johnston testified that he never saw Jackson with the marijuana found in the trunk. On redirect examination, Johnston testified that he was initially called to the scene as a regular assisting officer.

¶ 24    Retired Illinois State Police forensic scientist Deborah Magolan testified that the large Ziploc bag contained eight knotted plastic bags and 30 Ziploc bags of plant material. The eight knotted bags weighed 24.5 grams, and the 12 tested Ziploc bags weighed a total of 6.9 grams, for

a combined total weight of 31.4 grams. The plant material tested positive for the presence of cannabis.

¶ 25    An Illinois State Police forensic scientist testified the recovered handgun was in operating condition.

¶ 26    The State entered several stipulations. The first provided that the officers did not recover vehicle keys on Jackson's person. A second provided that, if called, an Illinois State Police latent print examiner would testify he examined the recovered handgun and did not find latent prints suitable for comparison. A third provided that Jackson had convictions of two qualifying offenses.

¶ 27    Defense counsel renewed Jackson's motion to suppress evidence based on the "new evidence" that Carey called for a canine unit before getting out of his squad car and alleging that Jackson was already in custody and being searched when the unit arrived. The State argued (i) Jackson's actions provided sufficient suspicion for Carey to conduct a *Terry* stop, (ii) the canine unit was called as regular backup, and  (iii) only after Jackson disclosed he had marijuana was he arrested and his SUV searched incident to the arrest. Defense counsel responded that before Carey smelled marijuana, police seized Jackson. The trial court denied Jackson's motion.

¶ 28    The jury found Jackson not guilty of armed habitual criminal and guilty of the lesser included offense of possession of more than 30 but not more than 100 grams of cannabis (720 ILCS 550/4(c) (West 2016)). Jackson filed a motion for judgment notwithstanding the verdict or a new trial, arguing, among other issues, that the trial court erred in denying his motion to suppress. The court denied Jackson's motion, noting that a different judge presided over the hearing on the original motion to suppress but based on the evidence at trial, the officers acted appropriately.

¶ 29    The trial court sentenced Jackson to two years' imprisonment, and denied his motion to reconsider the sentence.

¶ 30                                        Analysis

¶ 31    Jackson challenges the initial stop and protective pat-down, arguing the trial court should have granted his motion to suppress because he was seized in the absence of a reasonable, articulable suspicion of criminal activity. Jackson requests reversal of his conviction as the marijuana underlying his conviction should have been suppressed as the fruit of an unconstitutional search.

¶ 32    A defendant bears the burden of proof at a hearing on his motion to suppress evidence. *People v. Gipson*, 203 Ill. 2d 298, 306 (2003). Once a defendant makes a *prima facie* case that the police obtained the evidence by an illegal search or seizure, the burden shifts to the State to present evidence to counter the *prima facie* case. *Id.* at 306-07. The ultimate burden of proof remains with the defendant. *Id.* at 307.

¶ 33    We review a trial court's ruling on a motion to suppress according to a bifurcated two-prong standard. *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). We accord great deference to the trial court's factual findings and will reverse those findings if they are against the manifest weight of the evidence. *Id.* "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995). We then review *de novo* the trial court's ultimate legal ruling. *People v. Johnson*, 237 Ill. 2d 81, 88-89 (2010). Thus, we may engage in our own assessment of the facts presented at the hearing on the motion and trial, and draw our own conclusions regarding the appropriate relief. *Id.*

¶ 34    The United States Constitution and the Illinois Constitution protect people from unreasonable searches and seizures by the government. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6; *People v. Lopez*, 229 Ill. 2d 322, 345 (2008). "Reasonableness" generally requires a warrant supported by probable cause, but *Terry v. Ohio*, 392 U.S. 1 (1968) established an exception to the warrant requirement. *People v. Johnson*, 237 Ill. 2d 81, 89 (2010). Under *Terry*, a police officer may conduct a brief, investigatory stop when he or she has "a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere 'hunch.' " *People v. Gherna*, 203 Ill. 2d 165, 177 (2003) (quoting *Terry*, 392 U.S. at 27). Further, "when an officer is justified in believing that the individual whose suspicious behavior he [or she] is investigating at close range is armed and presently dangerous to the officer or others, the officer may conduct a pat-down search to determine whether the person is in fact carrying a weapon." *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001). An officer's valid reason to stop a person does not automatically justify the further intrusion of a search for weapons; the validity of an investigative stop presents a separate question from whether a search for weapons is valid. *Id.* at 433.

¶ 35    The fourth amendment only comes into play when a defendant is seized. So first, we determine when police seized Jackson. *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 16. Not every interaction with a police officer results in a seizure. *People v. McDonough*, 239 Ill. 2d 260, 268 (2010). Instead, courts have divided encounters into three tiers: (i) arrests or detentions supported by probable cause; (ii) brief investigative detentions or *Terry* stops supported by a reasonable, articulable suspicion of criminal activity; and (iii) consensual encounters involving neither coercion nor detention that do not implicate the fourth amendment. *Id.*

¶ 36    Police officers may approach and ask someone potentially incriminating questions without violating the fourth amendment if the person asked is willing to listen. *People v. Luedemann*, 222 Ill. 2d 530, 549 (2006). Whether a seizure occurred depends on whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter. *Id.* at 550. Factors indicative of a seizure include: (i) the threatening presence of several officers, (ii) the display of a weapon by an officer, (iii) some physical touching of the person, and (iv) the use of language or tone of voice indicating compliance with the officer's request might be compelled. *Id.* at 553 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). These factors are not exhaustive, and "a seizure can be found on the basis of other coercive police behavior." *Id.* at 557.

¶ 37    The parties disagree on when officers seized Jackson. Jackson asserts that seizure occurred when the officers arrived, "boxed" in his SUV, questioned, and frisked him. The State counters that Jackson was not seized until after Carey smelled marijuana and performed the protective pat-down. We find Jackson was seized as soon as two uniformed officers approached him from opposite directions, asked him what he was doing, and frisked him.

¶ 38    We agree with Jackson that the first *Mendenhall* factor—the threatening presence of several police officers—is satisfied. The State cites *People v. Cosby*, 231 Ill. 2d 262 (2008), for the proposition that the presence of two officers is not enough to transform an otherwise consensual encounter into a seizure. *Id.* at 278 ("presence of only two officers, without more, is not a factor that would indicate a seizure occurred."). We have more. Carey pulled behind Jackson's SUV and, with his lights on, sat facing the SUV for a full minute while waiting for backup to arrive. To any reasonable person this is investigatory behavior, not indicative of a consensual encounter. Once

the second police car came, the positioning of the officers' cars made it difficult, perhaps impossible, for Jackson to drive away.

¶ 39    More importantly still, the officers' approach prevented Jackson from getting back into his car to attempt to drive away, even if he had felt free to do so. The officers approached Jackson on the passenger side from opposite directions rendering it impossible for him to get back in the driver's seat absent a gymnastic climb through the SUV. This was not, as Carey described it, a "causual" manner of approach.

¶ 40    The second *Mendenhall* factor is absent. Though the officers were in uniform, which we can reasonably assume includes a duty belt with a gun, there is no indication the officers unholstered their guns or brandished them.

¶ 41    The third *Mendenhall* factor was present because it is undisputed that Carey frisked Jackson. The timing of the frisk is somewhat unclear, but on closer examination of the record, we can narrow it down. At the suppression hearing Carey described the initial conversation with Jackson about his tires, a question about whether he had anything illegal in his car, and then the frisk right after Jackson denied having contraband. At trial, Carey described a similar conversation about the tires. Then he described asking Jackson a series of questions including whether he had contraband on his person (Jackson denied it), whether he had contraband in the car (Jackson denied that too), and whether Carey had permission to search the SUV (Jackson declined).

¶ 42    After asking Carey questions about his carside interrogation, the State asked: "At any time did you conduct any sort of search *prior to that going on*?" Carey answered: "I did perform a protective pat down of the subject." We also know that, at the time of the frisk, Carey's only concern was with the presence of an additional weapon, not the possibility that Jackson had

contraband. Taking Carey's suppression hearing testimony and trial testimony together, Carey frisked Jackson after asking about the tires but before questioning him about contraband or for consent to search the SUV. This accords with the trial court's factual finding that police seized Jackson before he admitted to having marijuana on his person.

¶ 43    At the point of physical touching, we also find the fourth *Mendenhall* factor present. Even if we could classify Carey's accusatory conversation with Jackson about his tires as "casual," the tone shifted when Carey started asking Jackson about contraband. *People v. Kveton*, 362 Ill. App. 3d 822, 838 (2005) (finding seizure, in part, because officers accused defendant of possessing cannabis).

¶ 44    In short, we find Jackson seized at the moment officers touched him. At that point two officers had approached him from opposite directions, blocking his ability to walk away or to access the driver's side of his car, and had begun asking accusatory questions about his tires and possible contraband. This was not a consensual encounter.

¶ 45    Next, were the officers justified in conducting a *Terry* stop when they seized Jackson? We reiterate that under *Terry*, a police officer may briefly stop a person for temporary questioning if the officer reasonably believes that the person has committed or is about to commit a crime. *Gherna*, 203 Ill. 2d at 177 (officer must have "reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere 'hunch' "). To support a *Terry* stop, the officer "must be able to point to specific and articulable facts that, considered with the rational inferences therefrom, make the intrusion reasonable." *McMichaels*, 2019 IL App (1st) 163053, ¶ 22. In making this determination, courts consider the totality of the circumstances known to the

officer and view those facts " 'from the perspective of a reasonable officer at the time of the stop.' " *Id*. (quoting *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 14).

¶ 46    Considering the totality of the circumstances, we find the *Terry* stop invalid. The State argues that Jackson's act of running to his car is evidence supporting reasonable suspicion that a crime had been or was about to be committed. We have serious problems with that proposition as a general matter. See *In re D.L.*, 2017 IL App (1st) 171764, ¶¶ 4-6, 28 (flight, even in proximity to a recently committed crime, does not establish reasonable suspicion without more). But we do not have to rely on cases like *D.L.* because the State pulls the fact of Jackson's running out of context and attempts to make it appear suspicious by isolating it.

¶ 47    In *Illinois v. Wardlow*, 528 U.S. 119 (2000), the United States Supreme Court held that "unprovoked flight" or "headlong flight" when a person sees police is the "consummate act of evasion." *Id.* at 124. Here we find Jackson's flight was not "unprovoked." Carey testified that when he arrived in the parking lot Jackson was already walking to his car. Jackson did not notice Carey's squad car until he was "walking across" the portion of the parking lot where Carey was driving. Only then did Jackson run the rest of the way to his SUV. We see no evidence that Jackson was reacting to Carey behind the wheel of a squad car; instead, from Carey's testimony, Jackson wanted no more than to get out the way of traffic driving through the parking lot.

¶ 48    Jackson's behavior is far cry from *Wardlow*, where the defendant was on the side of the road and ran away from the street after seeing a caravan of police cars drive by. *Id.* at 121. In *Wardlow*, nothing other than the mere presence of the police officers inspired the defendant's flight. Here, it is unclear whether Jackson would have been able to tell that Carey was a police officer—his headlights were shining in Jackson's direction and his emergency lights were not on.

Whether or not Jackson could tell he was walking in front of a squad car, he, unlike the defendant in *Wardlow*, had an utterly non-suspicious reason to get out of the way. Though an innocent explanation is not sufficient to defeat reasonable suspicion, *People v. Rodriguez-Chavez*, 405 Ill. App. 3d 872, 876 (2010), we do not find it reasonable to ascribe *criminal* motives, which is what *Terry* requires, to Jackson's decision to get out of the way of an oncoming car.

¶ 49    Carey testified that Jackson removed something from his waistband and put it in the backseat of his car. We can dispense with this factor quickly because Carey repeatedly testified that he could not see—at all—what the object Jackson put in his backseat was. The best he could do was to testify that, in his experience, people sometimes carry guns in their waistbands. We recognize as we described at the outset that we must evaluate the totality of the circumstances from the perspective of a reasonable officer. *McMichaels*, 2019 IL App (1st) 163053, ¶ 22. At the same time, *Terry* requires the officer to have reasonable, *particularized* suspicion as to the defendant and conduct in front of him or her. *Terry*, 392 U.S. at 27 (we do not credit an officer's "unparticularized hunch."). Carey testified to nothing about the circumstances that would suggest Jackson had a gun. There was no call about a person with a gun; there was no glint of metal; there was no bulge; Jackson was not holding on to anything in his waist area as he ran. Carey's belief Jackson had a gun was *at best* a hunch, a sneaky speculation, nothing based on a set of articulable facts and circumstances.

¶ 50    We arrive, then, at the factor the parties dispute the most. The State argues that Carey smelled marijuana on Jackson's person before seizing Jackson and that the odor supported both the frisk and search of the SUV. Jackson responds that Carey did not smell marijuana until after

the seizure had occurred and, in any event, the odor of a decriminalized drug does not provide reasonable suspicion or probable cause to search without a warrant.

¶ 51    As to the odor, at trial Carey testified to smelling marijuana when he "initially made contact with [Jackson]." His testimony indicates he smelled marijuana either immediately after or contemporaneously with the frisk. Most importantly, Carey's only stated justification for the frisk was to check for weapons, not drugs, suggesting he did not yet have concerns about the presence of narcotics. Carey also explained that he asked Jackson about "illegal narcotics" on his person, then told him he smelled marijuana leading to Jackson's admission about smoking earlier in the day. After the suppression hearing, the trial court found that Jackson's seizure occurred before he made any admissions. In other words, the best evidence we have—supported by the trial court's findings—is  that Carey smelled marijuana after the seizure began. The odor, therefore, cannot be used as justification for the seizure. *Id.* at 19 (officer's action must be "justified at its inception").

¶ 52    When it comes to the totality of the circumstances used to justify Jackson's seizure we are left with two facts: (i) running to get out of the way of parking lot traffic and (ii) putting an unknown object into the backseat of an SUV. Even taking these facts together, Carey had only a hunch that Jackson may have engaged in criminal behavior. As a hunch is insufficient to justify a *Terry* stop, we reverse the trial court's denial of Jackson's motion to suppress. Without Jackson's admission or a search of the SUV, both of which came after and were products of the *Terry* stop, the State could not have proven Jackson guilty beyond a reasonable doubt. We, therefore, reverse his conviction outright. *People v. Trisby*, 2013 IL App (1st) 112552, ¶ 19.

¶ 53    Reversed